**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**June 17, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

_____

| | |
|---|---|
| BREEZE AVIATION GROUP, INC., <br><br> Plaintiff - Appellant, <br><br> v. <br><br> NATIONAL MEDIATION BOARD, <br><br> Defendant - Appellee, <br><br> and <br><br> AIR LINE PILOTS ASSOCIATION INTERNATIONAL, <br><br> Defendant Intervenor - Appellee. | No. 23-4079 |

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:22-CV-00514-TC)**

_____

Submitted on the briefs:[*]

Jonathan O. Hafen, Cheylynn Hayman, and Austin J. Riter, Parr Brown Gee & Loveless, Salt Lake City, UT, for Plaintiff-Appellant Breeze Aviation Group, Inc.

Trina A. Higgens, United States Attorney, District of Utah, and Anne E. Rice, Assistant United States Attorney, Salt Lake City, UT, for Defendant-Appellee National Mediation Board.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Johnathan Thorne, Scholnick Birch Hallam Harstad Thorne, Salt Lake City, UT, and Joshua J. Ellison and Matt Harris, Air Line Pilots Association, International, McLean, VA, for Defendant-Intervenor-Appellee Air Line Pilots Association, International.

_____

Before **HARTZ**, **BACHARACH**, and **ROSSMAN**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Breeze Aviation Group, Inc. appeals the dismissal of its complaint challenging the administration of a union-representation election by the National Mediation Board (NMB). The election resulted in the NMB's certification of the Air Line Pilots Association International (ALPA) as the representative of pilots employed by Breeze. Breeze argues that the NMB (1) improperly excluded trainee pilots from voting in the union election and (2) improperly refused to extend the cut-off date for voter eligibility to allow more pilot trainees to complete their training and become eligible to vote. Exercising appellate jurisdiction under 28 U.S.C. § 1291, we affirm the district court's dismissal of the complaint for lack of jurisdiction. Federal courts have jurisdiction to review NMB certification of union representation only where "the complaining party shows on the face of the pleadings that the certification decision was a gross violation of the Railway Labor Act [RLA] or that it violated the constitutional rights of an employer, employee, or Union." *Kiamichi R.R. Co. v. Nat'l Mediation Bd.*, 986 F.2d 1341, 1343–44 (10th Cir. 1993) (internal quotation marks omitted). The district court correctly determined that Breeze's complaint does not make the required showing.

2

I.     JUDICIAL REVIEW UNDER THE RLA

"The major objective of the Railway Labor Act was the avoidance of industrial strife [in the railway and airline industries], by conference between the authorized representatives of employer and employee." *Bhd. of Ry. & S.S. Clerks, Freight Handlers, Exp. & Station Emps. v. Ass'n for Benefit of Non-Cont. Emps.* (*Railway Clerks*), 380 U.S. 650, 658, 666–68, 671 (1965) (citation and internal quotation marks omitted). That is, strife is to be avoided through negotiations between labor and management. Before there can be negotiations, however, it is necessary to determine who will speak for what employees. The RLA declares that "[t]he majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of [the RLA]." 45 U.S.C. § 152, Fourth. ("Craft or class" is the term used by the RLA to refer to the group of employees that a union seeks to represent.[1]) But who decides what the "craft or class" is, who belongs to the craft or class, and who is the choice by the majority to be the representative?

The RLA assigns that task to the NMB. In the event of a dispute about who should be the representative of employees, "upon request of either party to the dispute," the NMB has the duty "to investigate such dispute" and then certify "the individuals or organizations that have been designated and authorized to represent the

---

[1] *See* National Mediation Board, Overview & FAQ, https://nmb.gov/NMB_Application/index.php/overview-faq/ [https://perma.cc/GTW3-WZP2].

3

employees." *Id.* § 152, Ninth. As part of the investigation, the NMB may conduct an election by secret ballot. *See id.* In any representation election, "the Board shall designate who may participate in the election and establish the rules to govern the election." *Id.*

What, then, is the role of the courts in selecting the employee representative? Extremely little. Noting (1) the purpose of the RLA to prevent industrial strife (which will continue until conference between labor and management can begin), (2) the fact that "[o]n only a few phases of this controversial subject has Congress utilized administrative or judicial machinery and invoked the compulsions of the law," and (3) the absence of any statutory provision authorizing judicial review (this was before the Administrative Procedure Act), the Supreme Court thought congressional intent to be plain—"the dispute was to reach its last terminal point when the administrative finding [by the NMB] was made. There was to be no dragging out of the controversy into other tribunals of law." *Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 302–05 (1943). "[T]o avoid the haggling and delays of litigation," Congress left arguments "in terms of policy and broad generalities as to what the [RLA] should provide" regarding an election to be resolved by the NMB, not subject to judicial review. *Railway Clerks*, 380 U.S. at 671 (holding that federal courts could not second-guess NMB's decisions (1) not to hold a hearing before making its craft-or-class determination for a representation election and (2) to use a ballot without a "no union" option).

4

In short, the RLA invests the NMB with near unbridled jurisdiction to resolve disputes regarding employee representation, including by holding union-representation elections and certifying union representatives in the railway and airline industries. *See* § 152, Ninth; *id.* §§ 181–88; *Railway Clerks*, 380 U.S. at 658–60. Thus, judicial review of NMB actions is "one of the narrowest known to the law." *Kiamichi*, 986 F.2d at 1343 (internal quotation marks omitted). An NMB decision regarding the conduct of a representation election is "reviewable only to the extent that it bears on the question of whether it performed its statutory duty to 'investigate' the dispute." *Railway Clerks*, 380 U.S. at 661. In particular, "[t]he power to resolve disputes concerning class or craft designations for a representation election belongs to the NMB . . . and not to the federal courts." *Kiamichi*, 986 F.2d at 1343.

The circuit courts have not strayed from this mandate. For example, the D.C. Circuit has held that it may do no more than "peek at the merits" to determine whether there has been an error as obvious as a "violation of specific statutory language, without extension to 'arguing in terms of policy and broad generalities as to what the Railway Labor Act should provide.'" *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Bhd. of Ry., Airline & S.S. Clerks*, 402 F.2d 196, 205 (D.C. Cir. 1968) (quoting *Railway Clerks*, 380 U.S. at 671) (reversing injunction ordered by district court requiring NMB not to conduct third election). And the Second Circuit has said that the "scope of judicial review and intervention is confined to instances of constitutional dimension or gross violation of the statute," *Brit. Airways Bd. v. Nat'l Mediation Bd.*, 685 F.2d 52, 55 (2d Cir. 1982) (internal

quotation marks omitted), and noted that "the statute reveals that there are relatively few commands capable of being violated" and that "all details and procedures" of its investigation of representation disputes are left to the NMB, *id.* at 56. The court had little trouble concluding that the federal courts lacked jurisdiction to hear a challenge to an NMB certification decision where the NMB held a representation election, specified those eligible to vote, and set the rules for the election. *See id.*

The circumstances in which circuit courts have reviewed NMB decisions relating to certification are very few and strictly limited. The D.C. Circuit ruled that it had jurisdiction to reverse an NMB certification decision where the court believed the NMB had acted outside of its jurisdiction by investigating who should represent employees after the merger of two airlines without its being requested to do so by or on behalf of employees. *See Ry. Lab. Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 658–59 (D.C. Cir. 1994) (en banc), *amended*, 38 F.3d 1224 (D.C. Cir. 1994); § 152, Ninth (NMB has duty to investigate a dispute concerning union representation "upon request of either party to the dispute"). And we have found two examples where circuit courts held there was federal jurisdiction to reverse an NMB decision not to investigate a representation dispute when required to do so by the RLA. In *Russell v. Nat'l Mediation Bd.*, 714 F.2d 1332, 1335, 1346–47 (5th Cir. 1983), the court ruled that the NMB's refusal to further investigate a dispute, once it learned that the employees who had applied to it for an investigation desired not to bargain collectively but to decertify their current representative, amounted to a failure to fulfill its statutory duty to investigate. And in *Int'l In-Flight Catering Co. v. Nat'l*

*Mediation Bd.*, 555 F.2d 712, 717–18 (9th Cir. 1977), the court reviewed and reversed the NMB's certification decision where it was "not unreasonable to conclude that there was no investigation" because, among other things, instead of conducting a true election the NMB had used employee signatures on cards requesting an election as a substitute for proper ballots expressing their views on who, if anyone, they desired to represent them.

We need not opine on the merits of these decisions. It suffices to observe how limited any review of NMB actions regarding certification has been. Summarizing the state of the law, this circuit declared as follows: "[U]nless the complaining party shows on the face of the pleadings that the certification decision was a gross violation of the Railway Labor Act or that [the NMB] violated the constitutional rights of an employer, employee, or Union," federal courts "lack jurisdiction to review class determinations made by NMB pursuant to its certification of a bargaining representative." *Kiamichi*, 986 F.2d at 1343–44 (internal quotation marks omitted) (court lacked jurisdiction to review NMB certification of railway employees in two distinct classes of engineers and trainmen rather than combining those two classes).

With this background, we turn to the specifics of the case before us.

## II.     THE DISPUTE

Because we are reviewing the dismissal of Breeze's complaint, we take the complaint's factual allegations as true for purposes of this appeal. *See Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir. 2009).

Breeze is an airline that operated its first commercial flight in May 2021. Because Breeze had plans for rapid growth, it hired a large number of pilots (whom it refers to as "Flight Deck Crewmembers") in 2021 and the beginning of 2022. Aplt. Br. at 5. By March 31, 2022, Breeze had 137 pilots on its payroll, 71 of whom were still in training. Such a high percentage of Breeze's pilots were trainees because there had been delays in the Federal Aviation Administration (FAA) certification of airplanes in Breeze's fleet of Airbus A220 aircraft, so Breeze could not start training pilots to fly those aircraft until January 2022.

On April 6, 2022, ALPA filed an application with the NMB seeking a union-representation election among Breeze's pilots. The NMB set a cut-off date for voter eligibility of March 31, 2022 (the last date of the pay period before ALPA's application).[2] Breeze provided the NMB a list of the 137 full-time pilot employees (including the trainees) as of March 31.

---

[2] The cut-off date is described in the NMB's "Representation Manual," which provides "general procedural guidance" to the NMB's staff, although the provisions of the manual are "neither obligatory" on Board staff "nor do they constitute the exclusive procedure for the NMB's investigation of representation matters pursuant to the [RLA]." National Mediation Board, Representation Manual (2022), Notice, https://nmb.gov/NMB_Application/wp-content/uploads/2022/01/Rep-Manual-2022-1.pdf [https://perma.cc/D8DF-N3NB]. The Manual defines as eligible voters "[a]ll individuals working regularly in the craft or class on and after the cut-off date." *Id.* § 9.2. And it states that the cut-off date is the "last day of the latest payroll period ending before the day" the NMB received the application to investigate the representation dispute. *Id.* § 2.3; *see id.* § 1.02; § 152, Ninth (NMB will hold a union-representation election or otherwise "investigate" a representation dispute "upon request of either party to the dispute").

ALPA challenged the inclusion of the 71 pilots who had not completed training and were not yet regularly flying for Breeze. Breeze responded that the 71 trainee pilots should be included in the representation election because they were full-time employees of Breeze at the cut-off date and were hired to perform the same work as the other pilots. Alternatively, Breeze asked that the NMB extend the cut-off date by six months to allow the trainee pilots to complete their training and vote in the election, given what Breeze characterized as the unusual circumstances of the significant expansion in the size of the craft or class (as Breeze would define it) before ALPA filed its application and the delay in training the pilots occasioned by the FAA's delayed review.

The NMB rejected Breeze's arguments, refusing to find the trainee pilots eligible or to modify the cut-off date. After removing from the list of eligible voters 7 pilots who were no longer employed at Breeze, the NMB oversaw the election among the remaining 59 eligible pilots. Of 50 votes cast, 29 voted in favor of representation, 20 voted against, and 1 voted for a write-in candidate. Based on those results, the NMB certified ALPA as the representative of all Breeze's pilots.

Breeze filed a complaint against the NMB in the United States District Court for the District of Utah, seeking (1) a declaration that the representation election was a gross violation of the RLA, (2) a declaration that the certification of ALPA was null and void, and (3) an injunction requiring the NMB to hold another election. The court granted APLA's motion to intervene. It ruled that no gross violation of the RLA had occurred, so it had no jurisdiction to review the NMB's decision. It accordingly

granted the NMB's motion to dismiss. Breeze appealed to this court. The NMB and ALPA have both submitted responsive briefs.

### III.  ANALYSIS

We review de novo a dismissal for lack of subject-matter jurisdiction, taking as true the factual allegations in the complaint. *See Smith*, 561 F.3d at 1097. As Breeze does not allege a constitutional violation, we examine its complaint solely for evidence of a "gross violation" of the RLA in the NMB's handling of the representation election among Breeze's pilots and its certification of ALPA as the pilots' representative. *Kiamichi*, 986 F.2d at 1344 (internal quotation marks omitted). Finding none, we affirm the order of the district court dismissing the complaint for lack of jurisdiction.

#### A.  Exclusion of Trainee Pilots from the Election

Before the NMB, Breeze argued that the trainee pilots should have been eligible to vote because it treated them similarly to the other pilots and because they were employees within the meaning of the RLA. The NMB rejected this argument, ruling the trainee pilots ineligible to vote because it "has long held that trainees are not eligible to vote in representation elections under the RLA until they perform line work," and there was no dispute that the trainees had not yet begun line work for Breeze. Aplt. App., Vol. I at 36.

Breeze now contends that in making this decision the NMB grossly violated the RLA by failing to adhere to its requirement that the "majority of any craft or class of employees shall have the right to determine who shall be the representative of the

craft or class for the purposes of this chapter." § 152, Fourth. Breeze claims that the RLA's definition of *employee* includes the trainee pilots and that excluding them from the union election thus meant that a minority of the pilot employees would decide the election, contrary to the RLA's requirement that a majority of pilot employees decide who shall be their representative.

But to vote in a representation election, one must be an employee *within the craft or class* whose representative is to be selected. *See* § 152, Fourth. And we see nothing in the RLA that would preclude the NMB from excluding from the craft or class of pilots those who are merely training for the position and are not eligible to serve the airline by flying planes. After all, it is the NMB, not a federal court, that decides the scope of the relevant "craft or class" for purposes of a representation election. *See Switchmen's Union*, 320 U.S. at 304–05 (affirming "the authority of the Mediation Board in election disputes to interpret the meaning of 'craft' as used in the statute" and holding that there is to be no "dragging out of the controversy into other tribunals of law" once the Board's decision is made); *Kiamichi*, 986 F.2d at 1343 (rejecting employer's arguments that the NMB was wrong to determine it had two crafts or classes of employees rather than only one, and explaining that the "power to resolve disputes concerning class or craft designations for a representation election belongs to the NMB . . . and not to the federal courts"). The NMB's decision regarding who could vote was far from a gross violation of a statutory command. *See* § 152, Ninth ("In the conduct of any election for the purposes herein indicated *the Board shall designate who may participate in the election* and establish the rules to

11

govern the election." (emphasis added)). "[H]ow it accomplishes this mission [of designating who may vote] is entirely its affair, as long as it makes certain the carrier does not interfere." *Brit. Airways*, 685 F.2d at 56. The NMB's decision to adhere to a long line of its precedents by requiring the trainee pilots to be performing regular line work before voting in the representation election was well within its discretion.

### B.   Refusal to Modify the Eligibility Cut-Off Date

Breeze also argued before the NMB that the voter-eligibility deadline should be extended to a date when it anticipated that all the trainee pilots would be flying commercial flights and therefore eligible to vote in the representation election. The NMB rejected this argument as well, because it generally fixes the cut-off date on "the last day of the latest payroll period ending before the NMB received the application," as it did here, and has changed the cut-off date only in "very rare cases" involving "unusual or extraordinary circumstances," which it found were not present in this case. Aplt. App., Vol. I at 37 (internal quotation marks omitted).

Breeze claims that the NMB's refusal to extend the eligibility cut-off date was a gross violation of the RLA, asserting that the NMB's decision in effect disenfranchised a majority of the employees of the relevant craft or class. To the extent this argument does not merely rehash Breeze's argument that the NMB committed a gross violation by not holding the trainee pilots eligible to vote, it is without merit. Decisions about voter-eligibility cut-off dates fall squarely within the NMB's discretion to "establish the rules to govern the election." § 152, Ninth; *see Brit. Airways*, 685 F.2d at 56 ("Selecting a cutoff date . . . [was a] decision[] well

12

within [the NMB's] discretion."). Breeze's argument to the contrary—that the NMB's decision, by excluding the trainee majority who would soon become pilots, in effect allowed a minority of the pilots to decide the union election—fails to point to any "specific requirement . . . in the Act" that the NMB violated, and does no more than argue "in terms of policy and broad generalities as to what the Railway Labor Act should provide." *Railway Clerks*, 380 U.S. at 671. "The very nature of the argument[] indicates" that deciding the eligibility cut-off date "is not subject to judicial review, for it was to avoid the haggling and delays of litigation that such questions were left to the [NMB]." *Id.*

## IV.    CONCLUSION

The NMB fulfilled its statutory duty to investigate and acted within the broad bounds of its statutory discretion when it designated who could participate in the election, set the rules that governed that election, and held the election itself. *See id.* at 661. Having confirmed as much, the district court correctly decided that it lacked jurisdiction over Breeze's claims. *See Brit. Airways*, 685 F.2d at 56 (explaining that the NMB did not act "in excess of delegated powers or contrary to specific statutory directions," and therefore the district court was without jurisdiction to review its certification decision, where the NMB "designated who could participate" and "set rules for the election"). We see no error in the dismissal of Breeze's complaint.

We **AFFIRM** the order of the district court.